PIKE et al. v. CINCINNATI REALTY CO.

(Circuit Court of Appeals, Sixth Circuit. May 3, 1910.)

No. 2,002.

1. LANDLORD AND TENANT (§ 156*)—CONSTRUCTION OF LEASE FOR LONG TERM —DESTRUCTION OF BUILDINGS BY FIRE—REBUILDING—PROCEEDS OF INSURANCE—"IN THE SAME CONDITION."

Improved city real estate left in trust by a will was leased for 99 years by authority from the court; the lease providing that the lessee should maintain the property in good condition and repair, that he should not remove nor destroy the improvements, that if he should cause improvements, repairs, or changes to be made he should "replace old improvements by new ones of equal value and fully as substantial," and that he should maintain insurance on the property, payable to the trustee of the estate, "for the use and benefit" of the beneficiaries under the will. It further provided that, should there be a partial or total loss of the buildings and improvements, the insurance money collected therefrom should "be applied and expended to replace said improvements upon said property in the same condition as before said damage occurred." *Held*, that such provisions were intended principally to afford security for the rent and the restoration of the property in unimpaired condition at the end of the term, and should be construed together with that purpose in view; that the provision that the insurance money should be used to replace the improvements "in the same condition" as before did not require the lessee, after the buildings had been destroyed by fire, to rebuild them in the same form as the old, but that his obligation was only to replace them with new ones "of equal value and fully as substantial," for which purpose he was entitled to the insurance money; nor did such provisions warrant the trustee, after collecting the insurance, and when the lessee was proceeding to build a large hotel on the property of four or five times the value of the old buildings, in refusing to pay over the insurance money on the ground that the beneficiaries did not approve of the building.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 567; Dec. Dig. § 156.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

179 F.—7

2. LANDLORD AND TENANT (§ 156*)—CONSTRUCTION OF LEASE FOR LONG TERM —REBUILDING AFTER FIRE.

Neither the fact that the estate owned a hotel in the vicinity with which the new one would come into competition, nor the fact that the new hotel also covered a lot not owned by the lessor estate, was a ground for the withholding of the insurance money by the trustee, in the absence of any such condition in the lease; it being shown that the part of the building on the leased property largely exceeded in value the old buildings, and that, if necessary at the end of the term, it could be separated from the remainder and made into a completed building at comparatively small expense.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 567; Dec. Dig. § 156.*]

3. TRUSTS (§ 315*)—COMPENSATION OF TRUSTEE—PAYMENT FROM FUND.

The practice of compensating a trustee out of a fund for his services in the care of it has no application to a case where he is simply subserving the interest of one party in a contest for possession of the fund.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 433, 440; Dec. Dig. § 315.*]

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

Suit in equity by the Cincinnati Realty Company against Ellen M. Pike, executrix and trustee, and others. Decree for complainant, and defendants appeal. Modified and affirmed.

F. B. James and John McMahon, for appellants.
F. O. Suire and Drausin Wulsin, for appellee.

Before SEVERENS, WARRINGTON, and KNAPPEN, Circuit Judges.

SEVERENS, Circuit Judge. The bill in this case was filed to obtain a decree requiring the appellant to turn over a fund which had come to his possession from insurance companies on account of the loss by fire of buildings situated on premises in Cincinnati, leased under and by the authority of a decretal order of the court of common pleas for 99 years, with a privilege of renewal and an option to purchase, by Albert C. Barney as the representative of certain beneficiaries of the will of Samuel N. Pike, deceased, to Powel Crosley, whose title has since been acquired by the Cincinnati Realty Company, the complainant in the suit. The right of the respective parties to this fund depends upon the due construction of various clauses in a paragraph of the lease which are here set forth:

"And the said lessee, for himself, his heirs and assigns, further covenants and agrees with the said Albert C. Barney, for and on behalf of the parties aforesaid, that he will at all times keep said property sound, tight, and thorough good repair; that he will not remove or destroy the improvements now on said property; and that if he shall cause improvements, repairs, or changes to be made upon said property, he will at all times replace old improvements by new ones of equal value and fully as substantial; and, further, that said lessee, on behalf of himself, his heirs and assigns, further agrees that he will at all times during the continuance of this lease keep said improvements, or the buildings thereon, and the rents thereof, insured in good and solvent insurance companies for not less than one hundred and sixty-five thousand dollars, to be made payable to said Ellen M. Pike, trustee, or to her successors in said trust, for the use and benefit of the parties entitled to the

same under the will of said Samuel N. Pike, deceased. It is further covenanted and agreed that should any partial or total loss of buildings or improvements occur and insurance money be collected therefrom, that said insurance money shall be applied and expended to replace said improvements upon said property in the same condition as before said damage occurred."

Other parts of the lease, and the circumstances leading up to and attending the making of it, which are supposed by counsel to aid in the construction of the stipulations contained in the paragraph above quoted, are to be referred to. As we have said, the lease was made under a decree of the court of common pleas. But we attach no particular importance to that fact in the construction of the lease. The authority to make it is not questioned, and, when made, we think it is subject to the ordinary rules of interpretation. During the pendency of the lease, the buildings on the premises were insured in the sum of $165,000 by the lessee, and the loss made payable to Ellen M. Pike, who was then trustee of the estate. Later on they were almost totally destroyed by fire and the losses were collected by her. Before she had completely collected the losses, the Cincinnati Realty Company, having obtained an assignment of the lease, was preparing to build, in the place of the buildings which had been destroyed, the large building now known as the "Sinton Hotel," the cost and value of which was many times greater than the value of the buildings which had been destroyed. Mrs. Pike, the trustee, after having devoted a small part to the repairing of a partly burned building on the leased property, refused to pay over the remaining bulk of the insurance money on demand by the Realty Company upon the ground that she and the beneficiaries, of whom she was one, did not agree to the structure which the Realty Company was preparing to build; and they have since maintained that attitude. If this position of the trustee is defensible, he might hold on to this money indefinitely unless the lessee should erect other buildings or should reconstruct the hotel in such form as would conform to the views of the lessors.

In support of the position taken by the trustee, his counsel point to, and chiefly rely upon, the final stipulation in the foregoing paragraph, wherein it is provided that, if any insurance money should be collected, it "shall be applied to replace said improvements upon said property in the same condition as before said damage occurred"; and they say that "the same condition" means the same forms of buildings and structures as before the fire. We do not so interpret this language. It seems to us to refer to the state, quality, or predicament of the buildings, etc., rather than to the structures themselves. This construction harmonizes with the other stipulations in the contract, while the other can only with difficulty be reconciled with them. In the first place, it is stipulated that the improvements on the premises should be kept in "thorough good repair"; then that the lessee shall not remove or destroy the improvements then on said property. This concerns his own acts. Next, apprehending that destruction from other causes than the lessee's own act might occur, as from fire, it is provided "that if he shall cause improvements, repairs, or changes to be made upon said property, he will at all times replace old improvements by new ones of equal value and fully as substantial" as the old. There is fair ground for believing that this last stipulation was intended to cover all kinds

of improvements and changes, whether resulting from his own acts or other causes, and that to the extent of his own destroying or removing it was intended to be compensatory for any disregard of that stipulation by the lessee. But we do not need to decide that question, for in this case the destruction of the old buildings was caused by accident, and not by the voluntary act of the lessee. Then comes the stipulation to keep up the insurance, with provision that, in case of loss, it should be paid to the trustee for the use of the beneficiaries under the will. And then is the stipulation as to how the money shall be used as above stated.

Now, without going further, we think it clear that the main object of these stipulations concerning demolitions, repairs, and reconstructions, was to maintain constantly the security for rent and the restoration of the property in an unimpaired condition at the end of the lease. They were dealing with the security of values. A stipulation that this insurance money should only be used to replace the old by the same kind of buildings would be inconsistent with the dominating provision that, if the lessee should replace old improvements by new, the latter should be of equal value and fully as substantial as the old. And the rule in such conditions is that all parts of the instrument shall be so read as to harmonize with each other. This stipulation about the use of the insurance money seems simply in aid of the main stipulation about reconstruction, and had the same object. Making the loss payable to the trustee and usable for the purpose stated was a device to prevent its going to the lessee, who might otherwise use it as his own, without restriction. His agreement to use it for the purpose specified gave the lessor the security of that obligation. It was not intended that the lessors for whom the lease was made should themselves expend the insurance money in the construction of new improvements. That duty was devolved upon the lessee, and was an implied covenant on his part that he would expend the money in "replacing" the new improvements for the old in as good a condition as they were before the fire. In the natural order of the things to be done, the trustee for the lessors would pay the insurance money over to the lessee. The latter could not perform his covenant until that was done, nor would he be charged with any duty in that regard until the lessors had performed their precedent obligation. Neale v. Radcliff, 15 Q. B. 916; Hunt v. Bishop, 8 Exch. 675. It was said by Redfield, J., in Day v. Essex County Bank, 13 Vt. 97:

"Where the parties are to perform concurrent acts, and the plaintiff's act forms the basis or consideration for defendant's act, the defendant may always excuse himself from performance by relying upon the failure of the plaintiff."

They had no right to withhold the money upon an apprehension that the lessee would violate his covenant by misappropriating it. If he should do that, or threaten to do it, they would have their remedy upon the covenant. Gorton v. Smart, 1 Sim. & St. 35. The default would be in not performing what possibly might be a condition subsequent. According to the old law, it might give ground for forfeiting the lease, if not condoned by the lessor. But the lessor might choose not to claim a forfeiture, and to go on with the execution of the lease, and

treat the default as simply a violation of a collateral covenant of the lessee. That this would be the legal result in such circumstances is shown by several decisions of this court. In re Pennewell, 119 Fed. 139, 55 C. C. A. 571; Union Stockyards Co. v. Nashville Packing Co., 140 Fed. 701, 72 C. C. A. 195; Quinlan v. Green Co., 157 Fed. 33, 40, 84 C. C. A. 537, 19 L. R. A. (N. S.) 849. We are not to be understood as admitting that this covenant of the lessee is of the dignity of a condition, either precedent or subsequent. We think it was neither, and gave no ground to the lessors for halting in the performance of their own stipulations.

The two principal reasons which the trustee assigns for construing the stipulation in question to require the lessee to restore the effigies of the old structures are these: First, that it would be natural to suppose that the Pike family would wish to preserve some memorial of the family and of their own associations with the property. If upon this suggestion we turn to the record, we find that not only in the lease, but in the course of the transaction on which it was made, no mention of the solicitude of the family in this behalf was made. The first suggestion that was made of it was when it was stated in the answer. That was too long after the making of the lease to be of value in interpreting it. Nor can we think that the lessors gave thought to this matter. The buildings on the premises had been built at an earlier day. They had been occupied for miscellaneous purposes, ranging from that of a hall sometimes fitted up for theatrical purposes, and sometimes for a merchants' exchange, at others for various public or social gatherings. The smaller rooms were used for miscellaneous purposes, as for restaurants, lodging rooms, kitchens, and other like uses. The buildings were respectable in appearance, and answered fairly well the current requirements in respect of their stability and their uses; but they were getting dilapidated and already in need of repair. The premises were in the heart of a large and growing city. Already in the near vicinity a larger and more massive style of buildings was being projected. It is incredible, without more evidence to go upon, that these parties intended or wished that for 100 years this spot should remain stationary, in order to furnish to the public the semblance of a family memorial. We can attribute no weight whatever to the suggestion.

The other reason, also stated for the first time in the answer, is that the Pike estate was then the owner of the "Burnet House," a hotel standing in the vicinity, and that it is not to be supposed that the lessors would grant a lease under which a rival hotel could be built and operated. But the way to effect the exclusion of such buildings was to use in the lease appropriate language to express the purpose, and not to rely on inferences which an astute interpreter might construct from doubtful language. Such a matter would be of considerable financial importance; and even if it were proven that the subject was considered by the parties at the time there would be serious difficulty in the way of importing such a limitation into the contract, which makes no mention of it. But, as we are not convinced that the parties had in mind a purpose to effect such a restriction, we will not inquire into the consequences which might ensue upon the other alternative. In

fine, there is nothing in either of the suggested reasons which ought to influence the court in forming its judgment upon the proper construction of the terms of this lease. No other reasons of more consequence and leading to a different conclusion from that which we reach, have been presented. Judge Thompson, in the court below, in a succinct and, as we think, sound opinion, disposed of the case upon a like interpretation of the stipulations of the lease.

Another question arising upon the manner of construction of the Sinton Hotel is pressed by the defendants for the purpose of showing that the complainant is not observing its duty of keeping the property intact and free from entanglement with, or subservient to, adjacent property. To make the matter clearer, we will state some of the facts on which defendants' objection is rested. The Pike property, which was the subject of the lease, while it had a northern frontage of 170 feet on Fourth street, one of the principal streets of the city, did not extend to the nearest streets to the east or west of it. Between Vine street on the west and the west side of the leased property there was another lot, some 29 feet and 4 inches wide, fronting also on Fourth street and located in the northwest corner of the square. This lot is called in the record the "Seasongood Lot." The fee simple was in other parties. But the Cincinnati Realty Company had acquired 99-year leases of it, paying rent to the owners. The Sinton Hotel extends over not merely the Pike property, but also the Seasongood lot, and there is therefore a frontage on both Fourth and Vine streets. There is nothing in the construction of the hotel to show or create any line of demarcation between the two properties. The defendants say that if their property should come back to them they might be obliged to pay the rent due for the Seasongood lot in order to enjoy their own property, and it might be a rent which they would not wish to pay. But if, as we think, the lessors were looking to the maintenance of value in their securities, rather than the forms of structures, their interests have been greatly improved. To begin with, the testimony shows that the Sinton Hotel, which is a massive building 10 stories high, cost and is of a value four or five times greater than that of the buildings standing on the property at the date of their lease. And it also shows that, if trouble should ever arise with the owners of the Seasongood lot, the hotel could be divided on the line, and a complete hotel could be finished up on the Pike property. The cost of making the change is shown to be not large, at least not so large as to compare with the improvement in value which the hotel standing on the Pike property would contribute to the value of the lessee's covenants in the lease. We think there is nothing of which the defendants can complain. More has been poured into their lap than was promised. Nor do we think that the violation, if this be a violation, of the obligation to keep the premises in good condition, furnishes any legal ground for the refusal of the defendants to pay over the insurance money; the latter covenant being first to be performed, as we have already pointed out.

Another matter remains to be considered. The defendants claim that before the insurance money is paid over there should be deducted and retained, either by the court below or by the probate court on leave

given by the court, certain charges which, as they are enumerated in appellants' brief, stand as follows:

"(a) To Jones & James for the following services: Balance service collecting said insurance money, not to exceed $————; advice given. Ellen M. Pike, administrator and trustee as aforesaid, as to said insurance money from time of fire to time of her death, not to exceed $————; advice given Rankin D. Jones, administrator and trustee as aforesaid, from Ellen M. Pike's death to the 1st day of June, 1909, not to exceed $————.

"(b) To the estate of Ellen M. Pike, deceased, for services during her lifetime in the matter of care of said insurance money, not to exceed $————.

"(c) To Rankin D. Jones, as administrator and trustee as aforesaid, for the care and disbursing said insurance money as in this decree provided, not to exceed $————.

"(d) To costs and expenses incurred by said Ellen M. Pike, as administratrix and trustee as aforesaid, as to collecting said insurance and as to said premises after the fire, $————."

We think the court below might properly allow to the trustee the necessary costs and expenses incurred in collecting the insurance money. But nothing should be allowed as against the complainant for any services or expenses rendered or incurred since that time. The trustee has not been acting as a trustee for the complainant, but has been in the service of the beneficiaries of the estate, and should look to them for his compensation. The complainant was entitled to receive what the trustee received, and it would be plainly inequitable that it should contribute to the expenses of a contest set up against it or incurred in consequence thereof. The practice of compensating the trustee out of the fund for his services in the care of it has no application to a case where the trustee is simply subserving the interest of one of the parties in a contest for the possession of the fund. In this case the trustee identified himself with the beneficiaries when he refused to turn over the money after collecting it.

The decree should be modified by an allowance to the trustee of the cost and expenses necessarily incurred in recovering the insurance money, if not already allowed and compensated for in the decree appealed from, and thereupon the said decree should be affirmed. It is so ordered.